1

2

3

4

5

6

7

8                              IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL LEE CHILDRESS, JR.,

11                    Petitioner,                    No. CIV S-02-0870 DFL GGH P

12          vs.

13   MIKE KNOWLES, Warden,

14                    Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17                  Petitioner, represented by appointed counsel, has filed a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner was sentenced to a term of 15 years to life

19   following his conviction by a Sacramento County trial jury of two counts of second degree

20   murder and one count of gross vehicular manslaughter, after having been charged with three

21   counts of murder arising from a traffic accident.  Amended Petition (AP), p. 2; Motion, p. 3, CT[1]

22   22, 433; RT[2] 1002-1003.  Pending before the court is petitioner's motion for judgment on the

23   pleadings, pursuant to Fed. R. Civ. P. 12(c), filed on April 18, 2005, and noticed for hearing, to

24   _____

25          [1]  Clerk's Transcript.

26          [2]  Reporter's Transcript.

1

1    which respondent filed an opposition on May 5, 2005; petitioner's reply was filed on May 10,

2    2005.  This matter came on for hearing on May 26, 2005.  Petitioner was represented by

3    Lawrence A. Gibbs; David A. Rhodes appeared for respondent.  While petitioner challenges his

4    conviction on three grounds, only one is at issue in petitioner's motion, that is claim two, in

5    which petitioner contends that the trial court's jury instructions on the intent required for implied

6    malice murder violated his right to due process and his right to a jury trial.  Motion, p. 2.

7            Although petitioner seeks judgment on the pleadings (relying on Ho v. Carey, 332

8    F.3d 587 (9th Cir. 2003)), a motion pursuant to Fed. R. Civ. P. 12(c) is not one recognized in the

9    context of habeas proceedings;[3] therefore, the court will adjudicate the motion in the standard

10   manner by which submitted petitions are adjudicated, that is, with reference to the entire

11   pleadings of this matter, which includes the underlying records of this case, as well as the

12   amended petition, answer and traverse, with the limitation that only the ground raised by the

13   motion is reached.  The court, of course, also considers the moving and responsive papers as well

14   as the oral argument upon the motion.

15   AEDPA

16           The AEDPA applies to this petition for habeas corpus which was filed after the

17   AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy,

18   117 S. Ct. 2059 (1997).   The AEDPA "worked substantial changes to the law of habeas corpus,"

19

20           [3]  Rule 12(c) of the Federal Rules of Civil Procedure provides that: "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the
21   pleadings.  If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary
22   judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

23           Judgment on the pleadings is appropriate "when there are no issues of material fact, and the moving party is entitled to judgment as a matter of law."  3550 Stevens Creek Assocs. v.
24   Barclays Bank, 915 F.2d 1355, 1357 (9th Cir. 1990).  In considering a motion for judgment on the pleadings, the court reviews the pleadings only.  The allegations of the non-moving party must
25   be accepted as true.  See Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1550 (9th Cir. 1989).  The burden is on the moving party to demonstrate that no material issue of
26   fact remains to be resolved and that the moving party is entitled to judgment as a matter of law. Id.

1    establishing more deferential standards of review to be used by a federal habeas court in

2    assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

3    Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

4            In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

5    Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

6    for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

7    between "contrary to" clearly established law as enunciated by the Supreme Court, and an

8    "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

9    to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

10   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

11   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

12           "Unreasonable application" of established law, on the other hand, applies to

13   mixed questions of law and fact, that is, the application of law to fact where there are no factually

14   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

15   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

16   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

17   deference is not blindly automatic, "the most important point is that an *unreasonable* application

18   of federal law is different from an incorrect application of law....[A] federal habeas court may not

19   issue the writ simply because that court concludes in its independent judgment that the relevant

20   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

21   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

22   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

23   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

24   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

25           The state courts need not have cited to federal authority, or even have indicated

26   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

1   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

2   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

3   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

4   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

5   established Supreme Court authority reviewed must be a pronouncement on constitutional

6   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

7   binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

8            However, where the state courts have not addressed the constitutional issue in

9   dispute in any reasoned opinion, the federal court will independently review the record in

10  adjudication of that issue.  "Independent review of the record is not de novo review of the

11  constitutional issue, but rather, the only method by which we can determine whether a silent state

12  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

13  2003).

14  Background

15           The court recites the facts of petitioner's case as set forth in the California Court

16  of Appeal Opinion appended to both the Amended Petition, as Exhibit A, and the Answer, as

17  Exhibit B:[4]

18           On the evening of Monday, October 14, 1996, Childress visited
             Lopez, his girlfriend, in Sacramento.[5]  They drove Lopez's younger
19           brother, Felix Torres, to the home of his friend, Brian Boss, where
             a group of young people, including Garcia, were "hanging out."
20
             Childress and Lopez then proceeded to the nearby home of
21           Childress's friend, Marwan Granville, whom their friend, Herbert
             Summerfield was visiting.  However, after Childress quarreled
22           with Lopez, she left Granville's house and walked back to Boss's
             house.  While there, Lopez talked briefly with Garcia whom
23           Childress had known in high school.  Unfortunately, animosity had

24  _____

25       [4] In the answer to the amended petition, respondent indicates that he relies on the exhibits
    that were included in his answer to the original petition.  Answer, p. 2, footnote 1.

26       [5] At the time of the incident, Childress was 19 years old and Garcia was 18 years old.

                                                    4

existed between Childress and Garcia in the past, although it had never developed into actual fighting.

After visiting with Granville and Summerfield, Childress drove back to Boss's house, picked up Lopez, and drove away. Lopez advised him that Garcia had been "talkin'" "trash" about him. Angered, Childress wanted to return to Boss's house, "mess with" Garcia, and end the confrontation that had been brewing between them for years, even if it meant fighting. However, Childress was concerned that the other people at Boss's house would outnumber him.

Accordingly, Childress drove back to Granville's house and got his two friends to accompany him to Boss's house where they could "watch his back." When they arrived, Childress, Lopez, Granville, and Summerfield all got out of the car. According to one witness, Childress approached Garcia and yelled, "What's up now, punk. Wanna fight?" Another witness testified that Childress used "challenging words." Garcia sat quietly and asked Childress what he meant. Childress continued to yell, repeating the same things over and over. Childress admits he said, "Why you talkin' shit?" Boss, however, approached Childress, saying that he did not want any fighting at his house. He asked Childress to leave. Childress agreed, and the foursome reentered the car and drove away. Childress drove Granville and Summerfield back to Granville's house.

After Childress departed, several of Boss's guests approached Garcia and began provoking him, asking if he was going to take such conduct from Childress. Eventually, Garcia got mad and said, "No, this ain't gonna go. This ain't gonna go. Something's gonna happen."

The evidence as to what happened next is conflicting. After leaving Granville and Summerfield at Granville's house, Childress claims he and Lopez went to McKinley Park for about an hour. However, Boss's guests claim Childress returned several times and did a "drive-by" in which he drove fast by the house, screeching his tires but not stopping. In either event, Childress and Lopez returned to Boss's house before midnight to pick up Torres.

As Childress approached Boss's house, he saw several other people there. One of them was Chris Villa, whom Childress had known from previous contacts in the neighborhood. Childress believed that Villa had gang affiliations. Lopez warned Chilldress that one of Villa's hands was near his waistline and that he might have a gun. Further, in Childress's eyes, "the number of people [had] doubled, and ... the guys ... there this time were a lot bigger...." Concerned for his safety, Childress drove past Boss's house without stopping.

5

Someone at the house saw Childress drive by and called out, "There he goes!"  Several people ran after Childress's car.  At the same time, Garcia and another of Boss's guests, Erick Ortega, got into Garcia's car and drove after Childress.

Garcia drove down Huntsman Street toward Kiefer Boulevard.  As he approached the intersection with Kiefer, he saw Childress's car ahead of him.  Childress turned from Huntsman onto Kiefer and accelerated.  Garcia gave chase, and the two of them sped down Kiefer, eventually reaching approximately 90 miles per hour.  Childress testified that he "stepped on the gas as hard as [he] could" since he was afraid Garcia would either run him off the road or shoot at him.  During the chase, the two cars changed lanes several times, with Garcia's car, in Childress's words, "stay(ing) right on my tail."

As the cars approached the intersection of Kiefer Boulevard and South Watt Avenue, the light at the intersection was red.  A wall built along Kiefer blocked the view of South Watt.  Childress saw that the light was red, but he did not want to stop because he claimed he was afraid of the car pursuing him.

As he neared the intersection, Garcia "could see that [Childress] wasn't slowing down for the red light in front of him."  Garcia reasoned that if Childress "was gonna run the red light, that it must be safe for [him], too."  Garcia claims that he "wanted to continue" his pursuit of Childress, in order "to talk to him and ... just to stop" their long-standing dispute.

At that moment, Bartlett was driving southbound on South Watt Avenue with Cave as a passenger.  The wall along the road prevented Childress and Bartlett from seeing each other until just before the intersection.  Childress drove into the intersection at approximately 90 miles per hour, despite the red light and limited visibility.  It appeared that Bartlett and Childress both applied their brakes at the last moment.

The collision killed both people in Bartlett's car and Lopez in Childress's car.  Childress suffered some injuries, but recovered.  Garcia saw the collision just ahead of him and was able to swerve and avoid hitting the other cars.  He spun around and off the road and then drove off without rendering aid.

Childress and Garcia testified in their respective cases and confirmed most of the foregoing events.

AP, Exhibit A; Answer, Exhibit B, July 28, 1999 unpublished state court of appeal decision, pp.

3-6.

\\\\\

Motion

As noted, petitioner moves for judgment on the pleadings on the second ground for relief upon which he proceeds, that the trial court's jury instructions on the intent required for implied malice murder violated his right to due process right and his right to a jury trial.  Motion, p. 2.  Petitioner brings his motion based on the pleadings and the holding of Ho v. Carey, 332 F.3d 587 (9th Cir. 2003).

Petitioner sets forth the following trial court instruction to the jury, informing that second degree murder is a general intent crime:

> In the crimes charged, and the crime of vehicular manslaughter, which is a lesser crime, there must exist a union or joint operation of act or conduct and general criminal intent.

> General intent does not require an intent to violate the law.

> When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent even though he may not know that his act or conduct is unlawful.[6]

Amended Petition (AP), p. 4, Exhibit (Exh.) C, CT 764, Exh. D, citing RT 978.[7]

Petitioner notes that the state appellate court found that the trial court's instruction that the crime of implied malice murder was a general intent crime was erroneous.  Motion (MTN), p. 4, Exh. A to AP, pp. 31-33.

Specifically, the state appellate court noted that the trial court gave "conflicting instructions" as to the intent required for implied-malice murder.  Exh., A to AP, pp. 31-32.  The court found that there was error but that it "was not prejudicial because the instruction could not have possibly confused the court's subsequent and clear recitation of the elements for second-

---

[6] This is the text of CALJIC 3.30, referenced by the appellate court, infra, as modified and erroneous.

[7] Unfortunately, respondent failed to lodge any pages of the Reporter's Transcript beyond page 900.  On July 1, 2005, the court ordered respondent to lodge volume 4 of the RT, encompassing pages 901 through 1060, containing the trial judge's instructions to the jury, which respondent did on July 7, 2005, discharging the court's order.

1    degree murder, including the element of malice." Id., p. 32, 33.

2           Noting the error in the modified CALJIC No. 3.30 instruction petitioner identified

3    above, i.e., the initial reference to "[i]n the crimes charged," the state court of appeals also

4    observed that the jury was properly instructed on the elements of second degree murder by

5    CALJIC 8.31[8] and on malice aforethought by CALJIC 8.11.[9] Id., p. 32, 33.  Moreover, the court

6    found that "[n]o instruction attached any significance to the misclassification of second degree

7    murder as a general intent crime." Id., p. 33.

8
9
10
11

> [T]he single instruction concerning general criminal intent was
> given three transcript pages *before* the instruction on the elements
> of murder.  The earlier, fleeting reference to general criminal intent
> could not have reduced in the jurors' minds the burden of finding
> the elements of second-degree murder, as set forth by the trial
> court.

12    Id. [Emphasis in original.]

13           The court also found that:

14
15
16
17

> [W]hile the trial court's version ...stated that in "the crimes charged
> and the crime of vehicular manslaughter" there must be a union of
> conduct and general intent, the instruction did not state that such
> intent was *sufficient*.  In light of its placement with the other
> instructions, it could not have been construed by the jury to relieve
> it of its task of considering whether [petitioner][10] acted with
> implied malice...for purposes of second-degree murder.

18    Id., p. 34 [emphasis in original].

19           The record shows that the following instructions did, indeed, succeed the

20    erroneous instruction:

21
22

> Homicide is the killing of one human being by another, either
> lawfully or unlawfully.

23

---

24    [8]  See partial text of trial court instructions, supra, and footnote 11.

25    [9]  See partial text of trial court instructions, supra, and footnote 12.

26    [10]  Actually, petitioner's co-defendant, Garcia, is the name which appears at this point.

Homicide includes murder and manslaughter, which are unlawful, and the acts of excusable and justifiable homicides, which are lawful.

Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder, in violation of Section 187(a) of the Penal Code.

In order to prove this crime each of the following elements must be proved:

One, a human being was killed;
Two, the killing was unlawful;
And three, the killing was done with malice aforethought.

A killing is unlawful, if it was not justifiable.

(Malice may be implied when:

One, the killing resulted from an intentional act;
Two, the natural consequences of the act are dangerous to human life;
And three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life.

When it is shown that a killing resulted from the intentional doing of an act with implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.

The word "aforethought" does not imply deliberation or the lapse of considerable time.

It only means that the required mental state must precede rather than follow the act.)[11]

(Murder of the second degree is the unlawful killing of a human being when:

One, the killing resulted from an intentional act;
Two, the natural consequences of the act are dangerous of human life;
And three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life.

---

[11] This court notes that this is CALJIC 8.11, the implied malice instruction referenced in an excerpt of the state appellate court opinion, supra, and marked by the undersigned herein in parenthesis (first set).

When the killing is the direct result of such an act it is not necessary to prove that the defendant intended that the act would result in the death of a human being.)[12]

To constitute murder or manslaughter there must be in addition to the death of a human being an unlawful act which was the cause of that death.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Every person who drives a vehicle in a grossly negligent manner and unintentionally but unlawfully kills another human being is guilty of the crime of vehicular manslaughter with gross negligence or without gross negligence in violation of Penal Code Section 192(c)(1) or 192(c)(2) respectively.

The killing is unlawful when a person commits an unlawful act not amounting to a felony which is dangerous to human life under the circumstances of its commission, or negligently commits an act ordinarily lawful which might produce death, which unlawful or negligent act is a cause of the death, of another human being.

In order to prove vehicular manslaughter with gross negligence or ordinary negligence each of the following elements must be proved:

One, the driver of a vehicle committed with gross negligence or ordinary negligence an unlawful act not amounting to a felony, which under the circumstances of its commission was dangerous to human life, namely, a violation of the basic speed law or running a red light or committed with gross negligence or negligently an act ordinarily lawful which might cause death;

And two, the unlawful or negligent act was a cause of death of another human being.

RT, vol. 4, pp. 980-983.

Respondent also emphasized the following subsequent instructions:

A murder charge contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element wantonness which is absent in gross negligence.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[12] This court notes that this is CALJIC 8.31, an instruction referenced in an excerpt of the state appellate court opinion, supra, and marked by the undersigned herein in parenthesis (second set).

10

1      [A] finding of implied malice for second degree murder depends
upon a determination that the defendant actually appreciated the
2      risk involved, that is, a subjective standard.

3  Id., at p. 985.

4      The instructions set forth immediately above set forth the requisite intent for the

5  specific intent crime of second-degree (implied malice) murder and relates general intent only to

6  the crime of vehicular manslaughter.   Standing alone, this court, under Middleton v. McNeil,

7  541 U.S. 433, 124 S. Ct. 1830 (2004), could not find the state court's finding of lack of prejudice

8  in the erroneous instruction isolated earlier an unreasonable application of clearly established

9  Supreme Court authority.  See discussion, infra.

10      However, petitioner also points to an interaction between jurors and the trial

11  judge during jury deliberations, wherein jurors asked whether they could rely on petitioner's fear

12  to convict him of a lesser included offense such as vehicular manslaughter.  MTN., p. 4.  Over

13  objection, the judge informed jurors that, because the charged offense was one of general intent,

14  the choice was all-or-nothing, that petitioner's fear could acquit him entirely under a duress

15  theory, that is, it could serve as a complete defense, but could not result in a conviction of

16  manslaughter.  Id.

17      Petitioner includes the question and answer as Exhibits E and F to his amended

18  petition.

19      At 10:15 a.m., the jury sent the following questions: "1.  Re: 4.43,
20  Does each of the 6 elements have to be present (or to exist) for a
defendant to be NOT GUILTY of the charged crime or a lesser
crime?  **2. Can fear be considered in moving from a 2nd degree**
21  **murder charge to a lesser charge OR would such fear**
**necessitate a verdict of not guilty?**  3.  If a defendant is found by
22  us to be not guilty of 2nd degree murder because of the defense of
necessity, can we find the same defendant guilty of vehicular
23  manslaughter?"  The Court notified counsel.  Counsel and the
Court met and the Court sent the jury the following response: "In
24  response to the jury's inquiry, the Court replies to the numbered
questions as follows: 1.  In the instruction 4.43 the elements
25  required to establish the defense of necessity are stated in the
conjunctive, i.e., each must be proven by a preponderance of the
26  evidence.  **2.  To establish general criminal intent the People**

11

1  **have the burden of proving beyond a reasonable doubt that the**
**conduct of a defendant was not the product of menace as**
2  **defined in instruction 4.40,[13] and the failure to do so would be a**
**defense to both the charged offenses and the lesser included**
3  **offenses.**  3.  To establish the defense of necessity the defendant
has the burden of proving each of its elements by a preponderance
4  of the evidence, and if such proof is established it would be a
defense to both the charged offenses and lesser included
5  offenses."[14]

6  CT, p. 839.

7        Petitioner also cites to the Reporter's Transcript to demonstrate the objection of

8  petitioner's trial counsel following the jury's verdicts:

9      Mr. Katz: ....One other matter, your Honor.  We need to put on the
record that concerns [sic] the Court's response to question number
10  two I believe.
The Court: Yes.
11  ****************************************************
Mr. Katz: ...Your Honor, specifically concerning question number
12  two of the 10:15 request of today's date.
The Court in response to that question indicate [sic] – in addition,
13  to the Court's response, we thought the question, "Can fear be
considered in moving from a second degree murder charge to a
14  lesser charge or would such fear necessitate a verdict of not
guilty?" expressed to the Court [sic], and Court would allow us to
15  put on the record after the fact.
We believe, in fact, fear could have been a factor that would have
16  moved away from the necessary implied malice.
And while even if not sufficient fear to vitiate the requisite
17  criminal intent, I believe that the jury could have found fear a
factor to believe that implied malice was not present, and that that
18  could have been something considered in reaching a verdict as
some form of vehicular manslaughter.

19

20      [13]  For clarification, this court notes the text of this instruction:
21  "CALJIC 4.40.  Duress – Threats And Menaces[:] A person is not guilty of a crime [other than
_____] when [he] [she] engages in conduct, otherwise criminal, when acting under threats and
22  menaces under the following circumstances:
1. Where the threats and menaces are such that they would cause a reasonable person to fear that
23  [his] [her] life would be in immediate danger if [he] [she] did not engage in the conduct charged,
and
24  2. If this person then actually believed that [his] [her] life was so endangered.
This rule does not apply to threats, menaces, and fear of future danger to [his] [her] life[,] [nor
25  does it apply to the crime[s] of (crime punishable by death) ]."

26      [14]  The court has taken the liberty of correcting the typographical (i.e., spelling) errors in
this excerpt from the Clerk's Transcript.  The sporadic capitalization has been maintained.

1    The Court: All right.  Record will so reflect.
      Mr. Katz: Thank you, your Honor.
2    The Court: In fact, the Court previously overruled you.
      Mr. Katz: Thank you.
3    The Court: That will be the order.

4    RT, vol. 4, pp. 1009-1010.

5            This court noted at oral argument two major hurdles facing petitioner: 1) that this

6    court owes deference to the state appellate court's finding that the instruction at issue, while

7    erroneous, was not prejudicial, and 2) even if the state appellate court's finding that petitioner

8    was not entitled to a "duress" defense, that is, entitled to have his fear considered to mitigate the

9    implied malice of second degree murder to manslaughter, is state law error, this court may not

10   rectify such in this habeas petition.

11           In relevant part, the state appellate court reasoned:

12           Second, on this record, Childress was not entitled to any duress
              instruction because the duress defense did not apply.  As *People v.*
13           *Steele* (1988) 206 Cal. App.3d 703, 706, explains, "The defense of
              duress, unlike the necessity justification, requires that the threat or
14           menace be accompanied by a direct or implied demand that the
              defendant commit the criminal act charged."  Here, there was no
15           direct or implied demand that he drive recklessly down Kiefer
              Boulevard into a blind intersection and cause a fatal collision.

16
              This point was clearly made in *People v. Richards* (1969) 269 Cal.
17           App.2d 768, 773.  As explained by the *Steele* court, the "*Richards*
              court correctly observed that '[t]he statute [§ 26 defining duress],
18           since it refers to the option to refuse or accept, contemplates that
              the threat or menace be accompanied by a direct or implied
19           demand or request that the actor commit the criminal act.'
              [Citations.]" (*Steele*, *supra*, 206 Cal. App.3d at p. 706.)  In this
20           case, no such demand or request was made.  Accordingly, no
              duress instruction was required. ([Footnote 9] Childress claims
21           duress should apply "[i]f, under all the circumstances, a reasonable
              person would have been impelled to avoid such threatened harm by
22           doing what was done by the defendant."  (Perkins, Impelled
              Perpetration, 33 Hastings L. J. (1981) 403, 416.)  However, in
23           California, by statute, those "circumstances" must include a
              demand or request to commit the criminal act.  (§ 26, *supra*, 206
24           Cal. App.3d at pp. 706-707.)  Here, they did not.)

25           Childress next complains that the duress instruction that he
              requested only referred to fear of danger to life, not of great bodily
26           harm.  As requested and given, CALJIC No. 4.40 provided for a

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

defense of duress to apply, the threats and menaces must be such "that they would cause a reasonable person to fear that *his life would be in immediate danger*." (Footnote 3, *ante*; italics added.) Childress contends the trial court erred by failing to modify this language sua sponte to provide that the defense may exist where he reasonably believes *either* his life is in danger, or he is in danger of great bodily harm.  The contention is based on *People v. Perez* (1973) 9 Cal.3d 651, 657, which noted the suggestion of *People v. Otis* (1959) 174 Cal. App.2d 119 that "the fine distinction between fear of danger to life and fear of great bodily harm is unrealistic." (174 Cal. App.2d at p. 124; see *People v. Pitmon* (1985) 170 Cal. App.3d 38, 49.)

We assume, without deciding, that Otis's gloss on the duress defense is correct.  Since Childress was not entitled to a duress instruction, there can be no error.

III.

Childress next contends the trial court erred by refusing to instruct the jury — for the first time during deliberations in response to a jury question — that "duress could negate malice aforethought and result in a manslaughter conviction."

The jury asked whether Childress's fear could "be considered in moving from a 2nd degree murder charge to a lesser charge or would such fear necessitate a verdict of not guilty?"  Childress urged the trial court to answer that his fear could negate the malice required for a murder conviction and lead to a conviction of vehicular manslaughter.  He argues that "a defendant's honest but unreasonable belief in duress may negate malice" and contends the trial court should have crafted a defense of "imperfect duress," analogous to the defense of imperfect self-defense. (See *People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082.) ([Footnote 10] The court rejected the suggestion and instructed that duress was a defense to both charged crimes and the lesser included offenses: "To establish general criminal intent the People have the burden of proving beyond a reasonable doubt that the conduct of a defendant was not the product of menace as defined in instruction 4.40, and the failure to do so would be a defense to both the charged offenses and the lesser included offenses.")

However, as we have explained, the defense of duress was not available to Childress in any form.  (See part II, *ante*.)  Thus, he was not entitled to an instruction that duress could negate malice and reduce his crimes from murder to vehicular manslaughter.

Exh. A to AP, Exh. B to Ans., pp. 15-17.

\\\\\

14

1    Even if wrong, as maintained by petitioner's counsel under state supreme court

2    law, this federal habeas court is limited with respect to reviewing state court errors of state law.

3    A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some

4    transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d 1083, 1085

5    (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is unavailable for

6    alleged error in the interpretation or application of state law.  Middleton v. Cupp, 768 F.2d at

7    1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

8    F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.

9    Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

10    The Supreme Court has reiterated the standards of review for a federal habeas

11    court.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).  In Estelle v. McGuire, the

12    Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

13    granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

14    evidence was incorrectly admitted under state law since, "it is not the province of a federal

15    habeas court to reexamine state court determinations on state law questions."  Id. at 67-68, 112 S.

16    Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

17    state law."  Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092,

18    3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

19    may not grant habeas relief where the sole ground presented involves a perceived error of state

20    law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

21    Protection clauses of the Fourteenth Amendment).

22    The Supreme Court further noted that the standard of review for a federal habeas

23    court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

24    the United States (citations omitted)."  Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

25    order for error in the state trial proceedings to reach the level of a due process violation, the error

26    had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

15

defined the category of infractions that violate "fundamental fairness" very narrowly.'" Id. at 73, 112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

State courts are "the ultimate expositors of state law," Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886 (1975), and this court is bound by the California Supreme Court's interpretation of California law except in those "extreme circumstances," Id., where the interpretation appears to be an "obvious subterfuge to evade consideration of a federal issue." Id. at n. 11, 95 S. Ct. at 1886.

Taking the second issue first, that of state law error, petitioner has a point, but unfortunately it is a point under state law.  In People v. Anderson, 28 Cal. 4th 767, 122 Cal. Rptr.2d 587 (Cal. 2002), the case cited by petitioner at oral argument for the proposition that the state supreme court has held that fear can be taken into account in evaluating whether the mental state exists for implied malice murder, that court ultimately held that duress was not a defense to murder.  While the majority stated that the state's high court had never decided the question whether a "'crime should be manslaughter rather than murder, on the theory that the pressure upon him, although not enough to justify his act, should serve at least to mitigate it to something less than murder'" [citation omitted], the court sidestepped the issue once again, stating that "[r]ecognizing killing under duress as manslaughter would create a new form of manslaughter, which is for the Legislature, not the courts, to do." People v. Anderson, 28 Cal. 4th at 781-783, 122 Cal. Rptr. 2d at 599-600.   To the extent that the state appellate court in this case asserted that duress is not a defense to murder in California, the opinion technically is not incorrect.

The Anderson majority, however, does make the following observation:

> The concurring and dissenting opinion also argues that duress
> especially should be a defense to implied malice second degree
> murder.  It evokes the image of an innocent person who is forced at
> gunpoint by fleeing armed robbers to drive recklessly, and who is
> then charged with murder when a fatal accident ensues.  In reality,

1    the situation is not so grim. *Although duress is not an affirmative*
     *defense to murder, the circumstances of duress would certainly be*
2    *relevant to whether the evidence establishes the elements of*
     *implied malice murder. The reasons a person acted in a certain*
3    *way, including threats of death, are highly relevant to whether the*
     *person acted with a conscious or wanton disregard for human life.*
4    (*People v. Watson* (1981) 30 Cal.3d 290, 300, 179 Cal. Rptr. 43....)
     *This is not due to a special doctrine of duress but to the*
5    *requirements of implied malice murder.*

6    <u>Anderson</u>, <u>supra</u>, at 779-780, 122 Cal. Rptr. 2d at 597 [emphasis added].

7          Although this passage is not specifically cited by petitioner, his argument appears

8    to be that the state appellate court opinion simply got the law wrong when it found that the trial

9    court had only deprived petitioner of a defense to which he was not entitled in answering the

10   jury's question the way the judge did—that fear (menace) had to be a complete defense or it was

11   of no consequence. In essence the trial court implicitly ruled out the use of fear except as

12   petitioner affirmatively proved the (unavailable) duress defense. Petitioner is legitimately

13   confused in respect to the phrasing of the issue herein because <u>Anderson</u> is confusing. "Fear,"

14   i.e. duress, is not a defense to murder, but it may be considered by a jury in concluding that a

15   defendant is not guilty of murder. There is thus no established mechanism directing a jury away

16   from murder to the lesser offense of manslaughter because of fear, but where else is a jury to be

17   directed once it determines that a defendant's fear of personal harm requires an acquittal on the

18   murder charge? Of course, the jury would then look to the lesser offense of manslaughter. Thus,

19   petitioner could argue that he was denied the opportunity to argue facts which act like a defense,

20   or he could argue that the prosecution was relieved of proving an element of murder given the

21   facts in this case. However, no matter how phrased, petitioner's root problem is an error in state

22   law by the trial judge, affirmed as the law of California by the appellate court. This federal

23   habeas court is not empowered to grant relief based on that error in state law. Despite the

24   seeming severity of this error, the court must move on to petitioner's first argument in this habeas

25   action.

26   \\\\\

17

1              In <u>Ho v. Carey</u>, 332 F.3d 587, 592 (9th Cir. 2003), heavily relied on by petitioner,

2    the Ninth Circuit found that the general-intent instruction, as in the instant case misapplied in the

3    context of a charge of second degree implied malice murder, was an instruction that was "flatly

4    erroneous" rather than simply "ambiguous."   That finding obviated the requirement of applying

5    the "'reasonable likelihood' standard employed for ambiguous jury instructions because "'the

6    disputed instruction is erroneous on its face.'" <u>Id</u>., quoting <u>Wade v. Calderon</u>, 29 F.3d 1312,

7    1321 (9th Cir. 1994).

8                   Under California law, to find a defendant guilty of second-degree
               murder based on implied malice, the jury must find that at the time

9                   of the killing the defendant intended to do an act that is dangerous
               to human life, with the knowledge that the act threatens life, and

10                  with a conscious disregard of that threat. <u>See</u> <u>People v. Nieto</u>
               <u>Benitez</u>, 4 Cal.4th 91, 13 Cal.Rptr.2d 864, 840 P.2d 969, 975

11                  (1992) (defining second-degree, implied malice murder); Cal.Penal
               Code § 187 (West 2003) (defining murder); <u>id</u>. § 188 (defining

12                  express and implied malice); <u>id</u>.§ 189 (defining second-degree
               murder based on implied malice).  A finding of general intent is

13                  not sufficient to convict a defendant of second-degree murder
               based on implied malice.  <u>People v. Zerillo</u>, 36 Cal.2d 222, 223

14                  P.2d 223, 229-30 (1950) (holding that it is error to give a general-
               intent instruction when specific intent is at issue).  Therefore, the

15                  trial court's instruction was erroneous under California law. The
               court's erroneous instruction on the elements of murder in the

16                  second degree was also constitutional error.  <u>Sandstrom v.</u>
               <u>Montana</u>, 442 U.S. 510, 523-24, 99 S.Ct. 2450, 61 L.Ed.2d 39

17                  (1979) (holding that a jury instruction that relieved the State of its
               burden to prove the element of intent was unconstitutional).

18

19   <u>Ho v. Carey</u>, <u>supra</u>, at 592.

20             In <u>Ho</u>, the trial judge erroneously instructed that the crime of murder was a

21   general intent crime.  The next day, at the urging of the prosecution, the trial judge said that "this

22   [following] instruction" only applies to involuntary manslaughter.  The court then read the

23   general intent instruction.  The Ninth Circuit found that the failure of the trial court to

24   affirmatively state that general intent did not apply to the previous day's murder instruction

25   relieved the prosecution of its burden of proof.  However, a Supreme Court decision issued the

26   next year places quite a bit of doubt on the efficacy of <u>Ho</u>, and as the "clearly established

1    Supreme Court law" would have to be followed now.

2           In Middleton v. McNeil, 541 U.S. 433, 437, 124 S. Ct. 1830, 1832 (2004), the

3    Supreme Court faulted the Ninth Circuit for failing to give the state court decision appropriate

4    deference when it held that an "erroneous imminent-peril instruction 'eliminated' respondent's

5    imperfect self-defense claim."  The Middleton Court, instead, determined that: "[g]iven three

6    correct instructions and one contrary one, the state court did not unreasonably apply federal law

7    when it found that there was no reasonable likelihood the jury was misled."  Id., at 438, 124 S.

8    Ct. at 1833.  Thus, in the context of instructions that are "internally inconsistent" and, therefore,

9    "at worst ambiguous,"[15] an isolated instruction cannot be said to constitute a due process

10   violation:

11            In a criminal trial, the State must prove every element of the
              offense, and a jury instruction violates due process if it fails to give
12            effect to that requirement.  See *Sandstrom v. Montana*, 442 U.S.
              510, 99 S. Ct. 2450, [] (1979).  Nonetheless, not every ambiguity,
13            inconsistency, or deficiency in a jury instruction rises to the level
              of a due process violation.  The question is "'whether the ailing
14            instruction...so infected the entire trial that the resulting conviction
              violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.
15            Ct. 475, [] (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147,
              94 S. Ct. 396, [] (1973)).  "'[A] single instruction to a jury may not
16            be judged in artificial isolation, but must be viewed in the context
              of the overall charge.'" *Boyde v. California*, 494 U.S. 370, 378,
17            110 S. Ct. 1190, [] (1990) (quoting *Cupp*, *supra*, at 146-147, 94 S.
              Ct. 396).  If the charge as a whole is ambiguous, the question is
18            whether there is a "'a reasonable likelihood that the jury has
              applied the challenged instruction in a way' that violates the
19            Constitution." *Estelle*, *supra*, at 72, 112 S. Ct. 475 (*quoting
              Boyde*, *supra*, at 380, 110 S. Ct. 1190).

20

21   Middleton, supra, at 437, 124 S. Ct. at 1832.[16]  Thus, if the sole issue before this court were the

22   erroneous instruction which the state appellate court in this case found erroneous but not

23   prejudicial, based on clearly established Supreme Court authority, the state court's finding could

24   ────────────────

25        [15] Middleton, supra, at 438, 124 S. Ct. at 1833.

26        [16] Because Ho predates Middleton, this court is not bound by it in the context of AEDPA
     in the manner that it would be if the Ninth Circuit case had followed the Middleton decision.

1    not be determined to be an unreasonable application of it because the general intent instruction

2    was isolated from the correct murder instructions, and could be no more than ambiguous in that

3    context.[17]

4            While the situation here starts out as a mirror image of <u>Middleton</u>, it winds up, of

5    course, as much more.  Here the trial judge told the jurors again—in response to a specific

6    question—that the prosecution's burden was to "establish general criminal intent."  At some

7    point, the general rule that juries are presumed to follow instructions comes into play in a

8    defendant's favor.  The last word on the subject was the judge's clear direction that all crimes

9    were those which required only a general criminal intent.  This is a <u>Ho</u>-plus situation at this

10   point.  Moreover, in terms of prejudice, on top of the judge's erroneous last word on general

11   intent, we have the weight of the judge's erroneous implied instruction under state law that fear

12   could not be used in the jury's assessment of implied malice.  The California Court of Appeal

13   glossed over this second "general intent" instruction.

14           In sentencing petitioner, the trial court noted that petitioner and his co-defendant

15   appeared "genuinely remorseful," were "distinctly different from the usual murder defendants"

16   he generally had before him, were young and without criminal records, and the judge expressed

17   confidence that they would be "fine citizens on the outside...."  RT, vol. 4, p. 1055.  However,

18   the court noted that, notwithstanding, the circumstances were such that petitioner's conduct (and

19   that of the co-defendant) rose to the level of implied malice murder.  <u>Id</u>.  And that is the crux of

20   the problem here in the error the trial judge compounded by beginning his response to the jury's

21   question by again conflating the criminal intent required by second degree murder with that

22   required for lesser included charges by referring only to the requirements for establishing

23

24           [17] Although irrelevant to the issue before this court, it seems at least somewhat illogical
      that petitioner was found to have committed manslaughter with respect to his passenger, an

25   individual of whose presence he was indisputably aware, but second degree murder as to two
      individuals of whose existence he was unaware until it was too late.  Perhaps, jurors imputed his

26   fear for his own safety to a fear for hers as well as and that he was acting to protect them both,
      although ill-advisedly, in speeding away from the individual pursuing him.

1   "general criminal intent".... That is, the trial court unconstitutionally diminished the prosecutor's

2   burden to prove implied malice with respect to the two counts of second degree implied malice

3   murder of which petitioner was convicted. <u>See</u> CT 839 & RT, vol. 4, p. 1009.   This

4   compounded error, reiterated *after* the corrections which the state appellate court opinion noted

5   in finding the initial error non-prejudicial, and in fact, made on the last day of jury deliberations,

6   distinguishes it from the isolated and ambiguous instruction identified in <u>Middleton</u>, <u>supra</u>, and,

7   instead, renders it an "'ailing instruction'" which "'so infected the entire trial that the resulting

8   conviction violates due process.'" <u>Estelle v. McGuire</u>, 502 U.S. 62, 72, 112 S. Ct. 475, [] (1991)

9   (quoting <u>Cupp v.</u> <u>Naughten</u>, 414 U.S. 141, 147, 94 S. Ct. 396, [] (1973)).   The state court

10   appellate opinion which glosses over this error by simply finding that petitioner was not entitled

11   to a defense of duress is an unreasonable application of clearly established Supreme Court

12   authority.

13   <u>CONCLUSION</u>

14           This was a tragic case in which three persons lost their lives stemming from an

15   escalation of petty rivalries, asserted "disrespect" and the like.   In one sense, that of moral

16   responsibility, there should be no excuse for such conduct, and no remission of consequences.

17   However, in a legal sense, the law requires that responsibility and consequences be attached in

18   degrees, and there are complex but required rules for attaching such.   The rules established by the

19   Supreme Court were not followed here.

20           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's motion for

21   judgment on the pleadings, filed April 18, 2005, be granted.

22           The court cannot at this time make a recommendation that the writ issue because

23   the case is not completely adjudicated.   Petitioner must make an assessment of the issues left to

24   be decided, and whether adjudicating them are worth further delay.   Therefore, within ten days of

25   today's date, petitioner shall either request to go forward on the remaining issues, or shall dismiss

26   them for want of probable merit.

1    These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

3    after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6    shall be served and filed within ten days after service of the objections.  The parties are advised

7    that failure to file objections within the specified time may waive the right to appeal the District

8    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9    DATED: 9/20/05

                                              /s/ Gregory G. Hollows

10   _____

                                              GREGORY G. HOLLOWS

11                                            UNITED STATES MAGISTRATE JUDGE

GGH:009

12   chil0870.mjp

13

14

15

16

17

18

19

20

21

22

23

24

25

26